**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE THE VILLAGE AT LAKERIDGE,
LLC, FKA Magnolia Village, LLC,
*Debtor*,

U.S. BANK N.A., Trustee, et al., by
and through CWCapital Asset
Management LLC, solely in its
capacity as Special Servicer,
*Appellant*,

v.

THE VILLAGE AT LAKERIDGE, LLC,
*Appellee*,

ROBERT ALAN RABKIN,
*Real Party in Interest*.

No. 13-60038

BAP No.
12-1456

IN RE THE VILLAGE AT LAKERIDGE, LLC, FKA Magnolia Village, LLC,
*Debtor*,

U.S. BANK N.A., Trustee, et al., by and through CWCapital Asset Management LLC, solely in its capacity as Special Servicer,
*Appellant*,

v.

THE VILLAGE AT LAKERIDGE, LLC,
*Appellee*,

ROBERT ALAN RABKIN,
*Real Party in Interest*.

No. 13-60039

BAP No. 12-1474

OPINION

Appeal from the Ninth Circuit
Bankruptcy Appellate Panel
Kirscher, Pappas, and Taylor, Bankruptcy Judges,
Presiding

Argued and Submitted
October 22, 2015—San Francisco, California

Filed February 8, 2016

Before: Richard R. Clifton and N. Randy Smith, Circuit Judges, and Robert S. Lasnik,[*] Senior District Judge.

Opinion by Judge N.R. Smith;
Partial Concurrence and Partial Dissent by Judge Clifton

## SUMMARY[**]

### Bankruptcy

The panel affirmed the Bankruptcy Appellate Panel's decision affirming in part, reversing in part, and vacating in part the bankruptcy court's order regarding confirmation of a Chapter 11 plan of reorganization.

Before a bankruptcy court may confirm a Chapter 11 plan, it must determine if any of the persons voting to accept the plan are insiders. The panel held that a creditor was not a statutory insider because he did not fall within one of the categories listed in 11 U.S.C. § 101(31). The panel held that the creditor did not become a statutory insider simply by receiving a claim from a statutory insider. In addition, the creditor was not a non-statutory insider because he did not have a close relationship with the debtor and negotiate the relevant transaction at less than arm's length.

---

[*] The Honorable Robert S. Lasnik, Senior District Judge for the U.S. District Court for the Western District of Washington, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the Bankruptcy Appellate Panel properly reversed the bankruptcy court's holding as to the creditor's statutory insider status and affirmed the bankruptcy court's holding as to his non-statutory insider status. Because the creditor was neither a statutory nor a non-statutory insider, the Bankruptcy Appellate Panel properly reversed the portion of the bankruptcy court's order that excluded the creditor's vote for plan confirmation purposes.

Concurring in part and dissenting in part, Judge Clifton agreed with the majority's legal conclusion that a person does not necessarily become a statutory insider solely by acquiring a claim from a statutory insider. Judge Clifton dissented as to the holding that the creditor was not a non-statutory insider.

**COUNSEL**

Gregory A. Cross, Keith C. Owens (argued), Jennifer L. Nassiri (argued), Venable LLP, Los Angeles, California, for Appellant.

Alan R. Smith (argued), Holly E. Estes, Law Offices of Alan R. Smith, Reno, Nevada, for Debtor/Appellee.

**OPINION**

N.R. SMITH, Circuit Judge:

Before a bankruptcy court may confirm a reorganization plan in a Chapter 11 bankruptcy, it must determine if any of the persons voting to accept the plan are insiders.[1] Insiders are either statutory or non-statutory. To be a "statutory insider," a creditor *must* fall within one of the categories listed in 11 U.S.C. § 101(31). A creditor does not become an insider simply by receiving a claim from a statutory insider. To be a non-statutory insider, the creditor must have a close relationship with the debtor and negotiate the relevant transaction at less than arm's length. Thus, Dr. Robert Rabkin does not qualify as a statutory or non-statutory insider.[2]

## I.    Factual Proceedings

### A.  The Parties

The debtor, Village at Lakeridge, LLC ("Lakeridge"), has only one member: MBP Equity Partners 1, LLC ("MBP"). MBP is managed by a board of five members, one of whom

---

[1] 11 U.S.C. § 1129(a)(10) ("The court shall confirm a plan only if all of the following requirements are met: . . . If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.").

[2] In this opinion, we address only Rabkin's statutory and non-statutory insider status. We resolve the remaining claims in a memorandum disposition filed concurrently with this opinion.

is Kathie Bartlett.[3] Bartlett shares a close business and personal relationship with Rabkin, which is unrelated to Bartlett's position with MBP.

U.S. Bank National Association ("U.S. Bank") is successor trustee to Greenwich Financial Products, Inc., the company through which Lakeridge financed a property purchase. At the time Lakeridge filed for bankruptcy, U.S. Bank was one of two creditors holding a claim on Lakeridge's assets. U.S. Bank held a fully secured claim worth about $10 million, and MBP held an unsecured claim worth $2.76 million.

## B.  Bankruptcy Court Proceedings

Lakeridge filed for Chapter 11 relief on June 16, 2011. On September 14, Lakeridge filed a Disclosure Statement and an initial Plan of Reorganization. Shortly thereafter, MBP's board decided to sell MBP's unsecured claim.[4] Bartlett, on behalf of MBP's board, approached Rabkin with an offer to sell the claim. On October 27, Rabkin purchased the claim for $5,000. In its Disclosure Statement, Lakeridge classified Rabkin's claim as a "Class 3 general unsecured claim."

On June 7, 2012, U.S. Bank deposed Rabkin, questioning him about his relationship with Lakeridge, MBP, and Bartlett.

---

[3] Although Bartlett signed Lakeridge's bankruptcy petition and all related documents on behalf of Lakeridge, she testified that she did not have authority to make decisions for MBP—or Lakeridge—on her own.

[4] Bartlett testified that MBP's board decided to sell its claim for two reasons: (1) the claim was useless to MBP because it could not vote the claim in favor of its reorganization plan; and (2) the board believed there "may be a tax advantage in selling [the] claim."

In his testimony, Rabkin indicated he had little knowledge of, and no relationship with, Lakeridge or MBP before he acquired MBP's claim. However, Rabkin testified that he had a close relationship with Bartlett, that he saw her regularly, including the day of the deposition, and that he had attended a meeting with his counsel and Lakeridge's counsel one hour before the deposition. Rabkin testified that he purchased MBP's unsecured claim as a business investment, that he had not known how much his claim was worth before the deposition, and that he knew the claim was a risky investment. Rabkin further testified that, prior to the deposition, he had not known his distribution under the proposed reorganization plan was $30,000. Rabkin claimed to have no interest in Lakeridge other than receiving a return on his investment.

U.S. Bank, through counsel, offered to purchase Rabkin's claim for $50,000 at the deposition. Rabkin said he would consider the offer. U.S. Bank, in an attempt to compel an immediate answer, increased its offer to $60,000. Rabkin again agreed to consider the offer, refusing to provide an answer on the spot. After Rabkin consulted with counsel, he did not respond to the offer. The offer lapsed. At a hearing on August 29, 2012, Rabkin stated he had felt pressured to accept U.S. Bank's cash offer while he was under oath, without having time to review it first.[5]

---

[5] The district court judge explained that he "underst[ood] the doctor or many people would have been put off by [U.S. Bank's approach to acquiring Rabkin's claim] and [he didn't] think it[ was] at all surprising that [Rabkin] would reject it and not really be interested in dealing with the people who made the offer to him thereafter."

On July 1, 2012, U.S. Bank moved to designate Rabkin's claim and disallow it for plan voting purposes ("Designation Motion"). U.S. Bank contended Rabkin was both a statutory and non-statutory insider, and that the assignment to Rabkin was made in bad faith. The bankruptcy court held an evidentiary hearing on the Designation Motion on August 1, 2012. In its subsequent order ("Designation Order"), the court held Rabkin was not a non-statutory insider, because:

> (a) Dr. Rabkin does not exercise control over [Lakeridge;] (b) Dr. Rabkin does not cohabitate with Ms. Bartlett, and does not pay [her] bills or living expenses; (c) Dr. Rabkin has never purchased expensive gifts for Ms. Bartlett; (d) Ms. Bartlett does not exercise control over Dr. Rabkin[;] (e) Ms. Bartlett does not pay [Dr.] Rabkin's bills or living expenses; and (f) Ms. Bartlett has never purchased expensive gifts for Dr. Rabkin.

The court also held that Rabkin did not purchase MBP's claim in bad faith. However, the court designated Rabkin's claim and disallowed it for plan voting, because it determined Rabkin had become a statutory insider by acquiring a claim from MBP. In other words, the bankruptcy court determined that, when a statutory insider sells or assigns a claim to a non-insider, the non-insider becomes a statutory insider as a matter of law.

Lakeridge and Rabkin both timely appealed the Designation Order, challenging the court's finding that Rabkin was a statutory insider for purposes of plan voting. U.S. Bank cross-appealed, challenging the findings that

Rabkin was not a non-statutory insider and had not purchased MBP's claim in bad faith.

## C. Bankruptcy Appellate Panel

The United States Bankruptcy Appellate Panel for the Ninth Circuit ("BAP") affirmed in part, reversed in part, and vacated in part the Designation Order. The BAP reversed the finding that Rabkin had become a statutory insider as a matter of law by acquiring MBP's claim and affirmed the findings that Rabkin was not a non-statutory insider and that the claim assignment was not made in bad faith.[6] The BAP held that insider status cannot be assigned and must be determined for each individual "on a case-by-case basis, after the consideration of various factors." Finally, the BAP held Rabkin could vote to accept the Lakeridge plan under 11 U.S.C. § 1129(a)(10), because he was an impaired creditor who was not an insider. U.S. Bank appealed. We have jurisdiction under 28 U.S.C. § 158(d),[7] and we affirm.

---

[6] The question of bad faith is addressed in the memorandum disposition filed concurrently with this opinion and will not be addressed here.

[7] Under 28 U.S.C. § 158(d), we "have jurisdiction of appeals from all final decisions, judgments, orders, and decrees" of the BAP. A decision is considered "final and . . . appealable where it 1) resolves and seriously affects substantive rights and 2) finally determines the discrete issue to which it is addressed." *Dye v. Brown (In re AFI Holding, Inc.)*, 530 F.3d 832, 836 (9th Cir. 2008) (quoting *Schulman v. California (In re Lazar)*, 237 F.3d 967, 985 (9th Cir. 2001)). When the BAP "affirms or reverses a bankruptcy court's final order," the BAP's order is also final. *Vylene Enters., Inc. v. Naugles, Inc. (In re Vylene Enters., Inc.)*, 968 F.2d 887, 895 (9th Cir. 1992). However, if the BAP "remands for factual determinations on a central issue, its order is not final and we lack jurisdiction to review the order." *Id.*

## II.    Standard of Review

We review the bankruptcy court's decision independent of the BAP's decision. *See Boyajian v. New Falls Corp. (In re Boyajian)*, 564 F.3d 1088, 1090 (9th Cir. 2009). Whether an insider's status transfers when he sells or assigns the claim to a third party presents a question of law. *Miller Ave. Prof'l & Promotional Servs., Inc. v. Brady (In re Enter. Acquisition Partners)*, 319 B.R. 626, 630 (B.A.P. 9th Cir. 2004). Establishing the definition of non-statutory insider status is likewise a purely legal inquiry. We review questions of law de novo. *Stahl v. Simon (In re Adamson Apparel)*, 785 F.3d 1285, 1289 (9th Cir. 2015).

Whether a specific person qualifies as a non-statutory insider is a question of fact. *Friedman v. Sheila Plotsky*

---

The bankruptcy court issued two orders: (1) the Designation Order (finding that Rabkin was not a non-statutory insider and had not acted in bad faith, but nevertheless designating his claim and disallowing it for plan voting purposes because he had acquired the claim from a statutory insider) and (2) the Discovery Order (denying U.S. Bank's Discovery Motions). Both bankruptcy court orders "finally determine[d]" Rabkin's right to vote on Lakeridge's reorganization plan and were therefore final orders. *See In re AFI Holding, Inc.*, 530 F.3d at 836.

However, the BAP's decision as issued was not final, because, although it affirmed and reversed portions of the bankruptcy court orders, it also remanded for discovery to allow factual determinations central to Rabkin's non-statutory insider status and ability to vote on Lakeridge's reorganization plan.

To make the BAP's decision final, U.S. Bank withdrew its arguments concerning the Discovery Order at oral argument, removing the need for remand. Because U.S. Bank withdrew its appeal concerning the Discovery Order, we will not discuss it in this opinion. Nor may U.S. Bank seek to enforce the BAP's holding on that issue at the bankruptcy court level.

*Brokers, Inc. (In re Friedman)*, 126 B.R. 63, 70 (B.A.P. 9th Cir. 1991), *overruled on other grounds by Zachary v. Cal. Bank & Tr.*, No. 13-16402, 2016 U.S. App. LEXIS 1368 (9th Cir. Jan. 28, 2016). We review factual findings for clear error. *In re Adamson Apparel*, 785 F.3d at 1289.

### III.    Discussion

"An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms [*sic*] length with the debtor." S. Rep. No. 95-989, at 25 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5810; H.R. Rep. No. 95-595, at 312 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6269. We recognize two types of insiders: statutory insiders and non-statutory insiders. Statutory insiders, also known as "per se insiders," are persons explicitly described in 11 U.S.C. § 101(31), such as "person[s] in control of the debtor." § 101(31). As a matter of law, a statutory insider has a sufficiently close relationship with a debtor to warrant special treatment. *In re Enter. Acquisition Partners*, 319 B.R. at 631. No one suggests Rabkin qualifies as a statutory insider in his own right.

A non-statutory insider is a person who is not explicitly listed in § 101(31), but who has a sufficiently close relationship with the debtor to fall within the definition. *See Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 395 (3d Cir. 2009) ("[I]n light of Congress's use of the term 'includes' in § 101(31), courts have identified a category of creditors, sometimes called 'non-statutory insiders,' who fall within the definition but outside of any of the enumerated categories."); *see also* § 101(31) (stating that "[t]he term 'insider' *includes*" the

listed categories (emphasis added)); § 102(3) (explaining that "includes" is "not limiting").

## A.  Statutory Insider Status

U.S. Bank asserts that Rabkin became a statutory insider when he acquired a claim from MBP. We disagree. A person does not become a statutory insider solely by acquiring a claim from a statutory insider for two reasons. First, bankruptcy law distinguishes between the status of a claim and that of a claimant. Insider status pertains only to the claimant; it is not a property of a claim. Because insider status is not a property of a claim, general assignment law—in which an assignee takes a claim subject to any benefits and defects of the claim—does not apply. Second, a person's insider status is a question of fact that must be determined after the claim transfer occurs. *See Concord Square Apartments of Wood Cty., Ltd. v. Ottawa Props., Inc. (In re Concord Square Apartments)*, 174 B.R. 71, 75 (Bankr. S.D. Ohio 1994). This determination does not ignore the public policy behind protecting secured creditors' interests in bankruptcy cases, as explained below.

The term "insider," as used in the bankruptcy code, is a noun, referring to a person (as defined at § 101(41)). *See, e.g.*, § 101(31) (defining "insider" as a person with a particular relationship with the debtor); *see also* § 1129(a)(10) (explaining that a court can cram down a reorganization plan when at least one class of impaired claims has voted to accept the plan, not including "any acceptance of the plan by an

insider"). The term "insider" is not, as U.S. Bank argues, an adjective used to describe the property of a claim.[8]

Whether a creditor is an insider is a factual inquiry that must be conducted on a case-by-case basis. *See, e.g.*, *In re Friedman*, 126 B.R. at 67, 70–71 (describing in detail the alleged insiders' relationships with the debtor); *Miller v. Schuman (In re Schuman)*, 81 B.R. 583, 586–87 (B.A.P. 9th Cir. 1987) (per curiam) (analyzing facts to determine whether the debtor and alleged insider had a sufficiently close relationship to warrant finding insider status). Courts may not bypass this intensive factual analysis by finding that a third party became an insider as a matter of law when he acquired a claim from an insider. If so, a third-party assignee could be foreclosed from voting a claim acquired from an insider, even if the entire transaction was conducted at arm's length. The bankruptcy code did not intend this result.

Further, if a third party could become an insider as a matter of law by acquiring a claim from an insider, bankruptcy law would contain a procedural inconsistency wherein a claim would *retain* its insider status when assigned from an insider to a non-insider, but would *drop* its non-insider status when assigned from a non-insider to an insider. *See In re Applegate Prop., Ltd.*, 133 B.R. 827, 833 (Bankr. W.D. Tex. 1991) (holding that an insider of a Chapter 11 debtor may never vote a claim toward plan confirmation, even if the insider acquired the claim from a non-insider); *In re Holly Knoll P'ship*, 167 B.R. 381, 385 (Bankr. E.D. Pa. 1994) (same).

---

[8] If U.S. Bank's argument were true, we would expect to find references to "the holder of an insider claim" rather than "an insider" in the bankruptcy code.

Section 1129 of Title 11 contains a number of safeguards for secured creditors who could be negatively impacted by a debtor's reorganization plan. A court may confirm a plan only if, among other requirements: (1) the plan and plan proponent comply with the bankruptcy code; (2) the plan is proposed in good faith; (3) the plan proponent has disclosed the identity of all insiders and potential insiders; (4) at least one class of impaired claims has accepted the plan (and no insider can vote); and (5) the plan "is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." § 1129. In addition, a court "may designate any entity whose acceptance or rejection of [a] plan was not in good faith, or was not solicited or procured in good faith." § 1126(e). Therefore, U.S. Bank overstates its argument that, unless we reverse the BAP, debtors will begin assigning their claims to third parties in return for votes in favor of plan confirmation.[9] We fail to see how establishing a rule that insider status transfers as a matter of law would

---

[9] For this assertion, U.S. Bank cites *In re Heights Ban Corp.*, 89 B.R. 795 (Bankr. S.D. Iowa 1988). There, the court concluded insider status must transfer with a claim upon assignment, otherwise "the operation of section 1129(a) would be seriously undermined. Debtors unable to obtain the acceptance of an impaired creditor simply could assign insider claims to third parties, who in turn could vote to accept." *Id.* at 799. Although the language in that case supports U.S. Bank's position, the facts do not. The assignor in *In re Heights Ban Corp.* transferred more than his claim; he and his co-shareholders also transferred their shareholder interests in the debtor to the assignee. *Id.* The court concluded that the assignors' and assignee's interests were "so interlocked . . . [as to be] indistinguishable with respect to the debtor for purposes of section 1129(a)(10)." *Id.* Thus, the assignee became an insider by becoming a shareholder of the debtor, not simply by acquiring a claim from a statutory insider.

better protect the creditors' rights than the current factual inquiry.[10]

In conducting a factual inquiry for insider status, courts should begin with the statute. If the assignee fits within a statutory insider classification on his own, the court's review ends; it need not examine the nature of the statutory insider's relationship to the debtor. *See In re Enter. Acquisition Partners*, 319 B.R. at 631. Because Rabkin did not become a statutory insider by way of assignment and was not a statutory insider in his own capacity, we must determine whether the bankruptcy court erred in finding that Rabkin was not a non-statutory insider.

## B. Non-Statutory Insider Status

Non-statutory insiders are the functional equivalent of statutory insiders and, therefore, must fall within the ambit of § 101(31). *See In re Winstar Commc'ns, Inc.*, 554 F.3d at 395. A creditor is not a non-statutory insider unless: (1) the closeness of its relationship with the debtor is comparable to that of the enumerated insider classifications in § 101(31), and (2) the relevant transaction is negotiated at less than

---

[10] U.S. Bank correctly points out that this court previously determined insider status does transfer with a claim under the general law of assignment. *See Greer West Inv. Ltd. P'ship v. Transamerica Title Ins. (In re Greer West Inv. Ltd. P'ship)*, No. 94-15670, 1996 WL 134293 (9th Cir. Mar. 25, 1996) (unpublished). However, Ninth Circuit Rule 36-3 prohibits parties from citing "[u]npublished dispositions . . . of this Court issued before January 1, 2007 . . . to the courts of this circuit." Thus, U.S. Bank should not have relied upon, or cited, *In re Greer West* in its arguments, and we are not bound by the decision.

arm's length.[11] *See Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.)*, 531 F.3d 1272, 1277 (10th Cir. 2008). A court cannot assign non-statutory insider status to a creditor simply because it finds the creditor and debtor share a close relationship. *See id.* at 1277–78.

A court must conduct a fact-intensive analysis to determine if a creditor and debtor shared a close relationship and negotiated at less than arm's length. Having—or being subject to—some degree of control is one of many indications that a creditor may be a non-statutory insider, but actual control is not required to find non-statutory insider status.[12] *See id.* at 1277 n.5. Likewise, access to the debtor's inside information may—but not shall—warrant a finding of non-statutory insider status. *See id.* at 1277.

---

[11] An "arm's length transaction" is: "1. A transaction between two unrelated and unaffiliated parties. 2. A transaction between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises." *Transaction*, *Black's Law Dictionary* (10th ed. 2014). The dissent quotes both definitions, but interprets them to mean that *any* affinity between two parties renders a transaction less than arm's length rather than returning to the definition in § 101(31) for guidance. *See* Dissent at 23.

[12] As noted by the Tenth and Third Circuits, if actual control were required for non-statutory insider status, all non-statutory insiders would also be statutory insiders under 11 U.S.C. § 101(31). § 101(31)(A)(iv) (defining "insider" as a "corporation of which the debtor is a director, officer, or *person in control*" (emphasis added)); § 101(31)(B)(iii), (C)(v) (defining "insider" as a "person in control of the debtor"); *In re Winstar Commc'ns, Inc.*, 554 F.3d at 396; *In re U.S. Med., Inc.*, 531 F.3d at 1279. Such construction of § 101(31) would render meaningless the language: "the term 'insider' *includes*."

U.S. Bank asserts the bankruptcy court erred in holding Rabkin was not a non-statutory insider. We review the bankruptcy court's factual finding for clear error.[13] *In re Friedman*, 126 B.R. at 70; Fed. R. Civ. P. 52(a)(6). "A finding is 'clearly erroneous' when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). We apply this highly deferential standard to findings of fact, because "[f]indings of fact are made on the basis of evidentiary hearings and usually involve credibility determinations." *Rand v. Rowland*, 154 F.3d 952, 957 n.4 (9th Cir. 1998) (en banc); *see also* Fed. R. Civ. P. 52(a)(6) ("[T]he reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."). Therefore, so long as the bankruptcy court's findings are "plausible in light of the record viewed in its entirety," we cannot reverse even if we "would have weighed the evidence differently." *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985).

---

[13] The dissent argues that "Rabkin's status [is] a mixed question of law and fact, subject to de novo review." Dissent at 25. Stating that an issue is a "mixed question" is simply the dissent's backdoor to reassessing the facts. As stated in Section II, we have two distinct issues in question, each with a different standard of review. First, we reviewed de novo the bankruptcy court's definition of non-statutory insider status, which is a purely legal question. Now, we must analyze whether the facts of this case are such that Rabkin met that definition, which is a purely factual inquiry and properly left to clear error review.

The bankruptcy court's finding that Rabkin does not qualify as a non-statutory insider is not clearly erroneous.[14] U.S. Bank presents no evidence that Rabkin had a relationship with Lakeridge comparable to those listed in § 103(31). Rather, the evidence shows Rabkin had little knowledge of Lakeridge—or its sole member MBP—prior to acquiring MBP's unsecured claim, much less access to inside information. Rabkin does not control MBP or Lakeridge, nor does Lakeridge or MBP have any control over Rabkin. U.S. Bank has shown that Rabkin had a close personal and business relationship with Bartlett, and that Bartlett approached Rabkin, and only Rabkin, with an offer to sell MBP's claim. However, Bartlett does not control MBP or Lakeridge. Rather, Bartlett was one of MBP's five managing members, all of whom discussed potential buyers and agreed to offer the claim to Rabkin. Rabkin did not know, and had no relationship with, the remaining four managing members of MBP.

U.S. Bank has not shown that Rabkin's relationship with Bartlett—who is indisputably a statutory insider of MBP and Lakeridge—is sufficiently close to compare with any category listed in § 103(31). Rabkin had no control over Bartlett, and Bartlett had no control over Rabkin. Rabkin and Bartlett kept separate finances, lived separately, and conducted business separately. The bankruptcy court properly evaluated these factors to determine whether Rabkin's

---

[14] The dissent explains how it would have decided this case had it been sitting as the bankruptcy court judge. However, it was not the bankruptcy court judge. The dissent did not preside over the evidentiary hearing and did not hear the evidence in person. This court cannot substitute its judgment for that of the bankruptcy court "simply because it is convinced that it would have decided the case differently." *Anderson*, 470 U.S. at 573.

relationship with Bartlett was close enough to make him an insider who was conducting business at less than arm's length with MBP.[15] Nothing in § 101(31) or case law indicates it would be improper for a debtor to sell, or even give, a claim to a friend if the friend is acting of his own volition and neither party is engaged in bad faith. *See In re Friedman*, 126 B.R. at 70 ("The case law that has developed . . . indicates that not every creditor-debtor relationship attended by a degree of personal interaction between the parties rises to the level of an insider relationship.").

Both Rabkin and Bartlett testified that, although Rabkin knew Lakeridge was in bankruptcy and that purchasing the claim was a risky investment, when Rabkin purchased the claim he did not know about Lakeridge's plan of reorganization or that his vote would be required to confirm it. Although Rabkin did not conduct an extensive inquiry into the claim's value prior to purchasing it, Rabkin explained that it was a small investment upon which Bartlett had indicated he could make a profit and "due diligence would have been very expensive."[16] Although Rabkin allowed U.S. Bank's

---

[15] The dissent asserts that the bankruptcy court applied the wrong legal standard because it did not state the words "arm's length transaction" in its final order. Dissent at 25. The court's failure to use the words "arm's length transaction" is irrelevant. The court's entire explanation is a description of why the transaction was conducted at arm's length and, hence, why Rabkin was not an insider. The court should not be discredited for listing the specific facts that made the transaction arm's length rather than merely stating a conclusion.

[16] The dissent argues that "the only logical explanation for Rabkin's actions" is that "[h]e did a favor for a friend." Dissent at 23. However, the bankruptcy court's explanation that Rabkin made a speculative investment at a relatively low cost and with the potential for a big payoff is equally logical.

offer to purchase the claim for $50,000 to lapse and subsequently voted in favor of Lakeridge's reorganization plan, he did so on the understanding that Lakeridge would amend the reorganization plan to increase his payout to an amount comparable to that offered by U.S. Bank.

These facts do not leave us with a "definite and firm conviction that a mistake has been committed." *See U.S. Gypsum Co.*, 333 U.S. at 395. Rather, the bankruptcy court's finding that, on the record presented, Rabkin was not a non-statutory insider is entirely plausible, and we cannot reverse even if we may "have weighed the evidence differently." *See Anderson*, 470 U.S. at 574.

## IV.    Conclusion

The BAP properly reversed the bankruptcy court's holding as to Rabkin's statutory insider status and affirmed the bankruptcy court's holding as to Rabkin's non-statutory insider status. Because Rabkin is neither a statutory nor non-statutory insider, the BAP properly reversed the portion of the bankruptcy court's order that excluded Rabkin's vote for plan confirmation purposes. Therefore, the judgment of the BAP is **AFFIRMED**.

---

CLIFTON, Circuit Judge, concurring in part and dissenting in part:

I agree with the legal conclusion that a person does not necessarily become a statutory insider solely by acquiring a claim from a statutory insider, as discussed in section III.A of the majority opinion.  As long as the interest previously

owned by a statutory insider was acquired by an independent party, for bona fide reasons, uninfected with the unique motivations of the insider, there is no reason that the insider taint should always be unshakeable.  The consideration of whether the insider status should stick to the interest properly depends on the particular circumstances and is appropriately treated as something to be determined based on the facts of the situation.  But it is clear to me, based on the facts of this case, that Robert Rabkin should be viewed as a non-statutory insider, and the bankruptcy court should treat his claim as such.  I respectfully dissent as to Section III.B.

The majority opinion, at 15–16, defines a creditor as a non-statutory insider when "(1) the closeness of its relationship with the debtor is comparable to that of the enumerated insider classifications in § 101(31), and (2) the relevant transaction is negotiated at less than arm's length." I agree.

The facts make it clear that this transaction was negotiated at less than arm's length.  Rabkin paid $5,000 to MBP (the sole member of the debtor, Lakeridge), for an unsecured claim against Lakeridge nominally worth $2.76 million.  MBP did not offer the interest to anyone else.  The purchase was not solicited by Rabkin.  It was proposed to Rabkin by Kathie Bartlett, a member of the MBP board. There was no evidence of any negotiation over price — Rabkin didn't offer less, and MBP didn't ask for more. Rabkin knew little if anything about Lakeridge (or, for that matter, MBP) before he bought the claim, nor did he conduct any investigation to ascertain the current value of that unsecured claim.  Even after he purchased the claim, he did not bother to find out more about what it might be worth. Prior to his deposition Rabkin did not even know what the

proposed plan of reorganization would pay him for the claim. After he learned that the payment under the plan would be $30,000, he was offered as much as $60,000 for his interest, but he declined that offer.[1]

The motives of MBP and Bartlett are clear and not denied. MBP is the sole member of Lakeridge. The Lakeridge reorganization plan cannot be approved unless there is a class of creditors willing to vote to approve it. Without the sale of this claim to Rabkin and his anticipated vote to approve the plan, that plan is dead in the water, Lakeridge will be liquidated, and there will be no hope for MBP to obtain anything for either the unsecured claim or, more importantly, its ownership of Lakeridge. It may have wanted to recover something from its unsecured claim, but it did not look for the best possible price because its Lakeridge ownership was far more important. MBP was primarily motivated to place the unsecured claim in the hands of a friendly creditor who could be counted on to vote in favor of the reorganization plan, opening the door to the possibility of obtaining approval of the proposed plan of reorganization.

Rabkin's motivation is a bit murkier, but it is clear that the transaction cannot be understood as a primarily economic

---

[1] The offer was made in a crude manner at Rabkin's deposition by the attorney for U.S. Bank. The manner in which the offer was presented and the demand for an immediate response weighs against putting much weight on Rabkin's rejection of the offer. Even after reflection and consultation with his counsel, however, Rabkin declined the offer and did nothing to pursue any opportunity to realize more than $30,000 for his interest. That behavior does not support the view that his motivations were purely economic or that his decision-making was that of a party acting at arm's length without regard for his personal relationship with an insider.

proposition on his part.  There was no evidence that he had a habit of making blind bets, say by helping out Nigerian princes or buying the Brooklyn Bridge.   There is an alternative explanation that makes a lot more sense.  As the majority opinion acknowledges, at 6, Rabkin had a "close business and personal relationship" with Bartlett, the person who proposed this transaction to him. I don't have to know the precise details of the relationship between Rabkin and Bartlett to conclude that it offers the only logical explanation for Rabkin's actions here.  He did a favor for a friend, and if it made some money for himself, so much the better.

Rabkin may not have been setting out to lose money or planning simply to give $5,000 to Bartlett, but that is not the standard. *Black's Law Dictionary* (10th ed. 2014) defines "arm's length transaction" as follows:

> 1. A transaction between two unrelated and unaffiliated parties.  2. A transaction between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises.

Rabkin and Bartlett were not "unrelated and unaffiliated parties."  The transaction was not conducted "as if the parties were strangers."  It was not an arm's length transaction.  As a result, under the definition recognized by the majority, Rabkin was a "non-statutory insider" because "the relevant transaction [was] negotiated at less than arm's length."

Rabkin at no point attempted to negotiate the price of his purchase, research the value of the claim that was offered to him, or otherwise behave in a manner that suggests that he took his acquisition seriously as an economic investment.

This "compels the conclusion" that Rabkin and Bartlett's relationship was "close enough to gain an advantage attributable simply to affinity rather than to the course of dealings between the parties." *In re Kunz*, 489 F.3d 1072, 1079 (10th Cir. 2007) (quoting *In re Enter. Acquisition Partners, Inc.*, 319 B.R. 626, 631 (B.A.P. 9th Cir. 2004)); *see also*, *Matter of Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992).

Moreover, though the majority opinion treats the bankruptcy court's determination that Rabkin was not a non-statutory insider as a factual finding subject to review only for clear error, I do not think that reflects a correct understanding of what the bankruptcy court decided. The specific facts of the episode were not seriously contested. Rather, the majority simply accedes to the bottom-line adjudication that, based on those facts, Rabkin was not an insider.

But that finding turns at least as much on the legal standard that defines a non-statutory insider as it does on the facts. Look at what the bankruptcy court said in explaining its conclusion that Rabkin was not a non-statutory insider, quoted by the majority opinion, at 8:

> (a) Dr. Rabkin does not exercise control over [Lakeridge; ] (b) Dr. Rabkin does not cohabitate with Ms. Bartlett, and does not pay [her] bills or living expenses; (c) Dr. Rabkin has never purchased expensive gifts for Ms. Bartlett; (d) Ms. Bartlett does not exercise control over Dr. Rabkin[;] (e) Ms. Bartlett does not pay [Dr.] Rabkin's bills or living

expenses; and (f) Ms. Bartlett has never purchased expensive gifts for Dr. Rabkin.

This list of facts would support a finding that Rabkin and Bartlett are separate financial entities, but it does not show that this transaction was conducted as if they were strangers. At no point does the bankruptcy court mention or refer to an "arm's length transaction" at all, let alone provide a sufficient basis for a finding that Rabkin and Bartlett were unrelated or dealt with each other as strangers. That is the standard the majority opinion and I both agree should apply, but it was not the standard actually applied by the bankruptcy court. The majority disagrees, stating, at 19 n.15, that the bankruptcy court's order "is a description of why the transaction was conducted at arm's length," but the majority opinion is conspicuously silent in explaining how the facts actually justify any such finding.

That tells me that the problem here is not with the facts as found by the bankruptcy court but with the legal test that the bankruptcy court applied. What standard did the bankruptcy court apply to determine whether this transaction was conducted at arm's length, by parties acting like they were strangers? We don't know, because the bankruptcy court order never discussed the concept. At a minimum, this makes Rabkin's status a mixed question of law and fact, subject to de novo review. *See In re Bammer*, 131 F.3d 788, 792 (9th Cir. 1997) ("Mixed questions presumptively are reviewed by us de novo because they require consideration of legal concepts and the exercise of judgment about the values that animate legal principles.").

I do not need to pursue that question further here, though, because even if the clear error standard applies, the finding

that Rabkin was not a non-statutory insider cannot survive scrutiny. The majority opinion states three separate times, at 17, 18 n.14 & 20, that we cannot reverse under the clear error standard simply because we would have decided the case differently, a telling sign that even the majority recognizes that support for the finding is thin at best. It even suggests, at 18 n.14, that this dissent presents nothing more than a statement of how I would have decided the case sitting as a bankruptcy judge. But my dissent is based on far more than a mere alternative view of the evidence. I cannot fathom how anyone could reasonably conclude that this transaction was conducted as if Rabkin and Bartlett were strangers. The clear error standard is not supposed to provide carte blanche approval of whatever the bankruptcy court might have found. That is especially true here, where the bankruptcy court never actually stated a finding that the transaction was at arm's length or that the parties conducted the transaction as if they were strangers. Under the proper definition of "arm's length transaction," Rabkin's acquisition of the claim was a transaction "negotiated at less than arm's length." He was a non-statutory insider, and his claim should be treated as such.

The majority's holding also has the troubling effect of creating a clear path for debtors who want to avoid the limitations the Bankruptcy Act places on reorganization plans. The Act allows courts to confirm bankruptcy plans if each class of claims or interests impaired under the plan votes to accept the plan. 11 U.S.C. § 1129(a)(8). Perhaps recognizing that unanimous agreement on a given bankruptcy plan would sometimes prove impossible, Congress also created an exception to § 1129(a)(8) allowing debtors to "cram down" a bankruptcy plan over the objections of some debtor classes. The cramdown provision allows courts to approve a bankruptcy plan so long as all provisions of

§ 1129(a) are met except for § 1129(a)(8), and the proposed plan is fair, equitable, and does not discriminate unfairly. 11 U.S.C. § 1129(b)(1). Even in the case of a cramdown, though, "at least one class of claims that is impaired under the plan [must have] accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10).

The legislative history on § 1129 is sparse and provides little insight into Congress's motives,[2] but in accordance with one of the most basic tenets of statutory interpretation, we must "interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *Boise Cascade Corp. v. U.S. E.P.A.*, 942 F.2d 1427, 1432 (9th Cir. 1991). Here, we are obligated to interpret § 1129 as a whole and in a way that gives each of its provisions meaning. A cramdown plan cannot be approved unless it is accepted by at least one class of impaired creditors.

Yet the majority opinion effectively renders that statutory requirement meaningless. Under the holding here, insiders are free to evade the requirement simply by transferring their

---

[2] As the Fifth Circuit has noted, "the scant legislative history on § 1129(a)(10) provides virtually no insight as to the provision's intended role." *In re Vill. at Camp Bowie I, L.P.*, 710 F.3d 239, 246 (5th Cir. 2013) (citing National Bankruptcy Conference, *Reforming the Bankruptcy Code: The National Bankruptcy Conference's Code Review Project* 277 (1994) (noting that the legislative history of § 1129(a)(10) "is murky, shedding little light on its intended role"); Scott F. Norberg, *Debtor Incentives, Agency Costs, and Voting Theory in Chapter 11*, 46 U. Kan. L.Rev. 507, 538 (1998) (noting that "[t]he legislative history . . . sheds little light on the rationale for section 1129(a)(10)")).

interest for a nominal amount (perhaps a few peppercorns) to a friendly third party, who can then cast the vote the insider could not have cast itself.

Contrary to the majority's assurances, the requirement that all votes be cast in good faith is not a check on this behavior. In the memorandum disposition issued alongside this opinion, we conclude that Rabkin's vote for the plan was cast in good faith because Appellants had not proven that he had "ulterior motives" for his vote to approve the plan beyond personal enrichment. By this standard, a savvy debtor can comply with the good faith requirement by following a simple formula: develop a reorganization plan that would provide a payout on the insider claim if approved, and then sell the claim to a friendly third party for a price lower than the payout. This enables the debtor to maneuver the third party into a position where it would be foolish not to vote for approval of the reorganization plan, ensuring a "yes" vote and thereby allowing the debtor to effectively avoid the requirement under § 1129(a)(10) that at least one non-insider must approve the plan.

Congress cannot have intended this outcome. If it had, it would not have required that at least one class of impaired creditors — excluding insiders — vote for a plan before it can be approved. Our holding here effectively negates that part of the statute.

I respectfully dissent.